**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| [UNDER SEAL] | ) | CIVIL ACTION NO. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | FILED IN CAMERA AND |
| | ) | UNDER SEAL |
| [UNDER SEAL] | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**DOCUMENT TO BE KEPT UNDER SEAL**

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET
CASE FILED UNDER SEAL

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America, ex rel. Jane Doe

**DEFENDANTS**
Select Medical Corporation; Select Medical Holdings Corporation ; Kessler Institute For Rehabilitation, Inc; and Encore Rehabilitation Services LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Shauna S. Itri
Joy Clairmont
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103   215-875-3000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal False Claims Act, 31 U.S.C. § 3729 et seq.
Brief description of cause:
Improper billing to Medicare for rehabilitation therapy services.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
06/17/2016

SIGNATURE OF ATTORNEY OF RECORD
*Shauna S. Itri*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a)**     **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    **(b)**     **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    **(c)**     **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**     **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>EX REL. JANE DOE, | ) ) ) | CIVIL ACTION NO. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | FILED IN CAMERA AND<br>UNDER SEAL |
| SELECT MEDICAL CORPORATION;<br>SELECT MEDICAL HOLDINGS<br>CORPORATION; KESSLER INSTITUTE<br>FOR REHABILITATION, INC; and<br>ENCORE REHABILITATION<br>SERVICES LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | JURY TRIAL DEMANDED |

### RELATOR'S COMPLAINT

On behalf of the United States of America, plaintiff-relator Jane Doe ("Relator") brings this action against Defendants Select Medical Corporation, Select Medical Holdings Corporation, Kessler Institute for Rehabilitation, Inc. and Encore Rehabilitation Services LLC for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

## I.     SUMMARY OF THE ACTION

1.     Beginning in at least 2010 and continuing through the present (the "Relevant Time Period"), at certain skilled nursing facilities in New Jersey and New York, Defendants have knowingly caused Medicare to pay for rehabilitation therapy services that were not covered by Medicare because the therapy services were not medically reasonable and necessary.

2.     This case focuses on Defendants' rehabilitation therapy services provided on a contract basis to 12 skilled nursing facilities in New Jersey and New York (referred to

1

collectively herein as the "Contracted Facilities").[1]  Defendants, through the Regional Director assigned to supervise the Contracted Facilities, set and enforced aggressive therapy and length of stay targets to maximize Medicare reimbursements and profits.  These targets were established without regard to the residents' actual conditions, diagnoses or therapy needs.  Instead, residents received excessive and unnecessary amounts and types of therapy to allow the facilities to qualify for higher reimbursement amounts from Medicare.

3.      Medicare pays a pre-determined daily rate for each day of skilled nursing facility rehabilitation therapy such as physical, occupational or speech therapy.  The daily rate is based on the Resource Utilization Group (RUG) to which a resident is assigned.  The assigned RUG levels depend on the number of skilled therapy minutes and the types of therapy the residents require to meet their therapy goals.  The highest daily rate is reserved for those residents assigned to the "Ultra High" RUG category, requiring ultra high levels of therapy, or a minimum of 720 minutes per week from at least two therapy disciplines (e.g., physical, occupational and speech).  The other RUG categories for less intense therapy needs and corresponding lower Medicare reimbursement are: Very High, High, Medium and Low.  The difference in the Medicare daily rate varies considerably, from as much as $755 for Ultra High to as little as $235 for Low.

4.      Specifically, Defendants instructed the staff at the Contracted Facilities to provide "Ultra High" levels of therapy services to at least 70-80% of Medicare residents and to keep them on therapy for at least 30 days.  Defendants reinforced these targets through training sessions, weekly conference calls, onsite visits, daily phone calls and emails.  Defendants closely

---

[1] Some of the Contracted Facilities did not maintain contracts with Select Medical throughout the *entire* Relevant Time Period, but rather contracted with Select Medical for part of the Time Period, *e.g.,* Crouse Community Center, Franklin County Nursing Home.

monitored and tracked the Contracted Facilities' success at meeting these goals.

5.     Defendants' fraudulent strategy was successful in that most, if not all, of the Contracted Facilities met the aggressive Ultra High therapy targets and some even exceeded them.  For example, in 2013, one of the Contracted Facilities, Buckingham at Norwood, had 100% of its Medicare residents receive Ultra High levels of therapy and at five other facilities, at least 90% of their therapy days throughout 2013 were billed at the Ultra High level.

6.     Through this conduct, Defendants have knowingly caused the United States to suffer millions of dollars in damages through inflated Medicare reimbursement.  For 2013 alone, Medicare reimbursement for therapy services at the Contracted Facilities totaled over $50 million dollars.  Therefore, the damages to the United States as a result of Defendants' scheme for the Relevant Time Period are potentially tens of millions of dollars.

## II.     **JURISDICTION AND VENUE**

7.     Jurisdiction is founded upon the FCA, 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331 and 1345.

8.     Venue is proper in the District of New Jersey under 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. § 1391(b) and (c).

## III.     **THE PARTIES**

9.     The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

10.     Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See 42

U.S.C. §§ 426 and 426A.   Medicare Part B provides outpatient medical care coverage to qualified beneficiaries. CMS, which is part of HHS, administers Medicare.

11.     Relator Jane Doe is a certified Speech Pathologist.   She learned of the fraud alleged herein during her employment from approximately 2013 to 2014 by Defendant Select Medical Corporation, including as a Director of Rehabilitation at one of the Contracted Facilities.

12.     Defendant Select Medical Corporation is a Delaware corporation with its corporate headquarters located in Mechanicsburg, Pennsylvania.   Select Medical is a subsidiary of Defendant Select Medical Holdings Corporation.   Select Medical Corporation and Select Medical Holdings Corporation operate acute care hospitals, inpatient rehabilitation hospitals, and outpatient rehabilitation centers and, until April 2016, provided contracted rehabilitation services at more than 400 nursing homes, hospitals and other facilities nationwide.

13.     Defendant Kessler Institute for Rehabilitation, Inc. ("Kessler") is based in West Orange, New Jersey and, like Select Medical Corporation, is a subsidiary of Select Medical Holdings Corporation.   Kessler provides a full range of rehabilitation services at rehabilitation hospitals and centers located primarily in New Jersey.   Kessler.Core, a division of Kessler, provides contract therapy services at some of the approximately 12 skilled nursing facilities relevant to this Complaint.

14.     Defendant Encore Rehabilitation Services LLC ("Encore") is headquartered in Farmington Hills, Michigan and provides rehabilitation services primarily to skilled nursing facilities.   In April 2016, Encore acquired Select Medical's contract therapy business for $65 million.

15.     Collectively Defendants Select Medical Corporation, Select Medical Holdings

4

Corporation, Kessler and Encore are referred to herein as "Defendants" or "Select Medical."

## IV.   THE MEDICARE PROGRAM

### A.   Medicare Coverage of Skilled Nursing Facility Rehabilitation Therapy

16.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  See 42 U.S.C. §§426, 426A.

17.    The Medicare program is divided into four parts that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

18.    Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (i.e., spell of illness) following a qualifying hospital stay of at least three consecutive days.   42 U.S.C. §1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).

19.    The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was received care in a skilled nursing facility (for a condition treated during the hospital stay).  42 U.S.C. §1395f(a)(2)(B); 42 C.F.R. §409.31(b).

20.    To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. §409.32(a), such as physical therapists, occupational therapists, or speech

pathologists. <u>See</u> 42 C.F.R. §409.31(a).

21.     Medicare Part A will only cover those services that are reasonable and medically necessary. <u>See</u> U.S.C. § 1395y(a)(1)(A); <u>see also</u> 42 U.S.C. §1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. §1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).   In the context of skilled rehabilitation therapy, this means that <u>the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity</u>. <u>See</u> Medicare Benefit Policy Manual, Ch. 8, §30 (emphasis added).

22.     In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  42 U.S.C. §13951(e).

**B.     <u>Medicare Reimbursement for Skilled Nursing Facility Rehabilitation Therapy</u>**

23.     Under its prospective payment system ("PPS"), Medicare pays an SNF a pre-determined daily rate for each day of skilled nursing and rehabilitation services the SNF provides to a patient. <u>See</u> 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).  Specifically, the daily PPS rate that Medicare pays an SNF depends on the Resource Utilization Group (RUG) to which a patient is assigned.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

24.     There are generally five rehabilitation RUG levels for beneficiaries that require rehabilitation therapy:  Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab

High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

25.     The rehabilitation RUG level to which a patient is assigned depends upon the projected number of skilled therapy minutes and the number of therapy disciplines the patient is anticipated to receive.  The chart below reflects the requirements for the given RUG levels and the Medicare reimbursement range for each level.  The reimbursement amount within each range depends on a number of factors, including the resident's ability to perform certain activities of daily living and their need for extensive services such as intravenous treatment or ventilator care.

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Medicare Reimbursement Range[2] |
|---|---|---|
| RU= Ultra high | Minimum 720 minutes per week total therapy combined from a least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $478.87 - $755.44 |
| RV=Very high | Minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $423.82 - $672.40 |
| RH=High | Minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $339.23 - $609.21 |
| RM=Medium | Minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines | $290.50 - $558.84 |
| RL=Low | Minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines | $235.62 - $490.78 |

63 Fed. Reg. at 26,262.

26.     Medicare pays the most for those beneficiaries who receive Ultra High levels of rehabilitation therapy, up to $755.44 per day according to rates in effect in 2014 for a non-urban SNF.  The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases

---

[2]  These rates were in effect in July 2014 for Crouse Community Center, an SNF located in a non-urban area.  SNFs located in urban areas would receive higher rates of reimbursement from CMS.

requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998). Whereas, for therapy provided at the lower RUG levels, Medicare reimburses as little as $235.62 per day.

27.     In general, a nursing facility must perform an assessment of each patient and complete a Minimum Data Set ("MDS") form. The MDS form, including the number of minutes of therapy and types of therapy in each discipline, is transmitted directly to CMS. 42 C.F.R. §483.20(f)(3). Completion of the MDS is a prerequisite to payment under Medicare. See 63 Fed. Reg. at 26,265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that resident receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS) – Version 2.0 for Nursing Home Resident Assessment and Care Screening.

28.     Each date the facility performs the assessment is known as the assessment reference date ("ARD"; referred to herein as "PPS ARD"). A nursing facility may perform the assessment within a window of time before the ARD, or, under certain circumstances, up to five days after the following days of the patient's stay in the facility: 5th, 14th, 30th, 50th, and 90th day. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the ARD. This seven day assessment period is referred to as the "look-back period."

29.     In addition to the required periodic assessments, SNFs are required to report a Change of Therapy ("COT") if the RUG level changes for a patient. 76 Fed. Reg. 48,486, 48,518 (Aug. 8, 2011). Specifically, at the end of each 7-day period after a PPS ARD, if the

8

therapy delivered during that period does not match the last reported RUG, then the SNF must report the actual level of therapy being delivered in a COT, and the reimbursement for that patient's care will be adjusted accordingly.  See id. at 48,518-26.  The SNF reports the COT through submission of an MDS form which is transmitted directly to CMS.

30.     To obtain reimbursement for therapy services, Form CMS-1450 is transmitted to the government.   A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code which is included on Form CMS-1450.   Medicare Claims Processing Manual, Ch. 25, §75.5.  Medicare payment will depend on the HIPPS code the nursing facility submitted as part of the CMS-1450.  See 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, §75.5.

31.     Skilled nursing facilities submit the CMS-1450 Form electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs").  MACs process and pay Medicare claims.  As of January 2016, the MAC processing Medicare Part A claims for New Jersey Medicare beneficiaries is Novitas Solutions, Inc. and for New York beneficiaries, National Government Services, Inc.

## V.     BACKGROUND

### A.     Select Medical's Relationship with the Contracted Facilities

32.     Select Medical provides skilled rehabilitation therapy services – physical, occupational and speech language therapy services – to SNFs and other customers nationwide. Residents of SNFs may need skilled rehabilitation such as speech, physical and occupational therapy after an illness or surgery requiring hospitalization.

33.     This case focuses on 12 facilities that hired Defendants on a contract basis to provide skilled rehabilitation therapy services to residents at their facilities.  Defendants do not own these 12 facilities, but provide all speech, physical and occupational therapy services to the

9

residents of these facilities.  These 12 SNFs are primarily located in Central and Northern New Jersey.  However, there is one facility located outside of New York City in Rockland County, one in Central New York and one in Northern New York (referred to collectively herein as the "Contracted Facilities").

34.    The 12 Contracted Facilities are as follows:

| Contracted Facilities | | Provider ID | Address |
|---|---|---|---|
| 1. | Crouse Community Center ("Crouse") | 335068 | 101 South Street Morrisville, NY |
| 2. | Franklin County Nursing Home ("Franklin County") | 335293 | 184 Finney Boulevard Malone, NY |
| 3. | Green Hill | 315416 | 103 Pleasant Valley Way West Orange, NJ |
| 4. | The Jewish Home at Rockleigh ("The Jewish Home") | 315473 | 10 Link Drive Rockleigh, NJ |
| 5. | Ramapo Manor Center for Rehabilitation and Nursing ("Ramapo Manor") | 335148 | 30 Cragmere Road Suffern, NY |
| 6. | Abingdon Care & Rehabilitation Center ("Abingdon")*[3] | 315141 | 303 Rock Avenue Green Brook, NJ |
| 7. | Ashbrook Care & Rehabilitation Center ("Ashbrook")* | 315064 | 1610 Raritan Road Scotch Plains, NJ |
| 8. | Buckingham at Norwood ("Buckingham")* | 315290 | 100 McClellan Street Norwood, NJ |

[3] The SNFs designated with an "*" are all located in Central and Northern New Jersey and are all part of Windsor Healthcare Communities.  See http://www.windsorhealthcare.org/.
Kessler.Core, a division of Defendant Kessler, provides rehabilitation services at these facilities.

| Contracted Facilities | | Provider ID | Address |
|---|---|---|---|
| 9. | Llanfair House Care & Rehabilitation Center ("Llanfair")* | 315142 | 1140 Black Oak Ridge Road Wayne, NJ |
| 10. | Merwick Care & Rehabilitation Center ("Merwick")* | 315001 | 100 Plainsboro Road Plainsboro, NJ |
| 11. | Venetian Care & Rehabilitation Center (formerly known as Briarwood Care & Rehabilitation Center) ("Venetian")* | 315188 | 901 Ernston Road South Amboy, NJ |
| 12. | Windsor Garden Care & Rehabilitation Center ("Windsor Garden")* | 315178 | 140 Park Avenue East Orange, NJ |

35.    One Select Medical Regional Director, Dwight Faustino ("Faustino"), managed and continues to manage all 12 Contracted Facilities.  Faustino has held the position of Regional Director at Select Medical throughout the Relevant Time Period.  Faustino is based in East Windsor, New Jersey, although he regularly travels to all of the Contracted Facilities, including those located in New York.  He provides all training, guidance and supervision of the 12 Contracted Facilities and directly reports to Vice President Remko VanderVoordt.

**B.    Skilled Rehabilitation Therapy at the Contracted Facilities**

36.    Select Medical employs all the staff necessary to provide skilled nursing facility rehabilitation services at the Contracted Facilities.  Generally, this staff is comprised of physical therapists, occupational therapists, speech therapists, therapy assistants and a Director of Rehabilitation.

37.     In order to be eligible for Medicare payment for Part A residents, the rehabilitation therapy scheduled for each resident must meet the particular medical needs of the resident and must be reasonable in terms of duration and quantity.  If a resident needs skilled rehabilitation, then the therapists from each relevant discipline (i.e., physical therapy, occupational therapy, or speech therapy) would evaluate the resident and develop a treatment plan.

38.     One of the main responsibilities of the Director of Rehabilitation (DOR) at the Contracted Facilities was to schedule the number of physical, occupational, and speech therapy minutes for the residents to meet their rehabilitation goals as set forth in their treatment plans. This was very important because the number of therapy minutes determined the RUG category, with the higher RUG categories of Ultra High or Very High requiring more therapy minutes (720 and 500 per week respectively) and, consequently, earning more in Medicare reimbursement. Thus, Select Medical through its DORs controlled the number of therapy minutes and types of therapy scheduled for residents and, consequently, the RUG levels billed to Medicare for residents' rehabilitation therapy.

## VI.     Defendants Set and Enforced Ultra High RUG Level and Length of Stay Targets Based on Profits Rather Than Medical Need and Manipulated Assessment and Discharge Dates to Maximize Profits

39.     Defendants through Regional Director Dwight Faustino set aggressive Ultra High RUG and length of stay targets specifically for Medicare Part A residents staying at the Contracted Facilities.  These goals were specifically set with regard to Medicare Part A beneficiaries and did not apply to other residents.

40.     Regional Director Faustino instructed the DORs to schedule Ultra High therapy services for at least 70-80% of Medicare Part A residents and to keep them on therapy for at least 30 days.  The pressure was directed specifically at the DORs.  These aggressive targets were set

to maximize Medicare reimbursement and profits and without regard to the individual resident's actual condition, diagnoses or medical needs.  Further, Defendants manipulated assessment and discharge dates to maximize profits.

41.     As alleged in Sections A and B below, Faustino conveyed these directives through training sessions, weekly conference calls, onsite visits, daily phone calls and emails. Defendants monitored and tracked the Contracted Facilities' success at meeting these goals, as set forth in Section B below.

42.     Regional Director Faustino indicated that it was Select Medical's expectation that its Contracted Facilities meet the directive to bill at least 70-80% Medicare Part A patients at Ultra High levels.  It is Relator's belief that Faustino received these instructions from his direct superior, Vice President Remko Van der Voordt.

43.     As a result of these directives, the DORs at the Contracted Facilities routinely scheduled most Medicare Part A patients to receive Ultra High levels of therapy instead of tailoring the number of therapy minutes and types of therapy to the resident's actual clinical needs. That is, because of Defendants' targets, the DORs would by default schedule almost all Medicare Part A patients for Ultra High levels of therapy and if not Ultra High, at least Very High.

44.     If done properly, the DOR should have reviewed the resident's medical record including the therapists' treatment plans, and scheduled the appropriate type(s) of therapy disciplines (physical, occupational or speech) and the number of minutes to address the patient's therapy needs.  Instead, the DOR by default would schedule the number of minutes and therapy disciplines necessary to reach the Ultra High RUG level.  Select Medical's online electronic medical records system, Casamba, would then indicate based on the number of minutes and

therapy disciplines scheduled that the Ultra High RUG level would be achieved if performed by the therapists. The first assessment or PPS ARD was not until about 5 days after the resident began receiving therapy and was basically a "rubber stamp" of the fraudulent Ultra High RUG level of therapy being performed by the therapists.

45.     Defendants' fraudulent practices detailed herein were aimed at increasing profits for themselves and the Contracted Facilities. Faustino was very clear in emphasizing that the Contracted Facilities hired Select Medical to make the facilities money. He said, in essence, "We're the ones who keep the lights on in the nursing home" and it was their duty to provide all therapy possible to patients so as to maximize Medicare reimbursement and make money for Select Medical and the Contracted Facilities.

**A.     Defendants Trained Staff at the Contracted Facilities on How to Maximize Profits Without Regard to Patients' Needs**

46.     Regional Director Faustino was responsible for training all of the DORs at the Contracted Facilities in the region. Typically, he provided two days of in-person training on how to perform the job duties of a DOR. He indicated that the training was essentially the same training provided to all of the DORs at the Contracted Facilities. Relator received this training before she worked as a DOR at one of the Contracted Facilities.

47.     At the training, Faustino explained that it was the DOR's responsibility to keep track of all the residents on a therapy program and schedule the number of therapy minutes for all of the residents. He specifically conveyed at the DOR training and other meetings that it was the Company's expectation that the DOR maintain at least 70%-80% of all Medicare Part A patients at an Ultra High level of therapy. The DOR was to monitor and track the residents' RUG levels on a daily basis and was responsible for maintaining the Ultra High levels. The DOR was responsible for running reports daily to make sure residents were receiving Ultra High

therapy levels.  If the levels dropped below 70%-80%, then it was the DOR's responsibility to figure out why this drop had occurred and to increase the percentage again.

48.      Even after a patient had been scheduled for a certain number of minutes of therapy, various circumstances could lead to a variation between the actual number of therapy minutes being provided versus what had been scheduled.  Among other issues, patients would sometimes refuse therapy; patients might not be available when the therapist showed up, perhaps asleep or at a meal; or patients might be so uncooperative or tired during therapy that the therapist is unable to provide the scheduled number of minutes.  Faustino made clear to the DORs that they were accountable for making sure that the highest number of scheduled minutes was provided by the therapists, regardless of the problems that might be encountered.

49.      Faustino gave very specific guidance on how to achieve Ultra High therapy levels in scheduling residents for therapy.  These instructions did not consider the rehabilitation needs of the patients as set forth in the therapists' treatment plans, but rather focused on the number of minutes and types of therapy required by Medicare to get paid at the Ultra High or Very High levels.  These instructions were specifically tailored to the Medicare billing requirements for RUG Ultra High or Very High:

> a.    To achieve the **Ultra High** RUG level, the DOR should schedule two of the three therapy disciplines (physical, occupational and/or speech therapy) with one therapist providing 75 minutes per day of therapy and another providing 70 minutes per day.  Or, if there were to be all three therapy disciplines provided to one resident, then the physical and occupational therapist would need to see the resident 60 minutes per day and the speech therapist 30 minutes a day.

> b.    If the DOR had to put someone at a RUG level of **Very High**, then two therapists could see the resident for 50 minutes each per day or one therapist could see the resident for 100 minutes per day.

50.      He stated that the <u>minimum</u> RUG level assigned to a resident was High and that

the DOR should not designate any residents at the RUG level of Medium or Low. The residents should at least be at the RUG level of High and preferably higher. If based on the therapists' treatment plans for the resident, the resident were projected to be at a RUG level of Low, Faustino instructed the DOR to not put them on a therapy program and only schedule an evaluation for them, as no matter what the resident's level of need, they were not to be placed on a therapy program at the Low level (only at Ultra High, Very High or High).

51.     During the two-day training session and continuing afterwards, Faustino provided other specific directions to the DORs aimed at maintaining fraudulent Ultra High therapy levels for Medicare patients and receiving as much reimbursement as possible from Medicare:

- Medicare Part A residents received priority. The DORs were directed to schedule the Medicare Part A residents' therapy in the morning, early in the day and before residents with other types of insurance. All therapy for Medicare Part A residents was to be scheduled for the morning so that if the resident was unable at that time to do the therapy (ill, sleeping, refusing treatment), the therapist would have the rest of the day to return to the resident's room to get in the required number of therapy minutes.

- All Medicare Part A residents should receive both physical and occupational therapies, at a minimum. According to Faustino, this was a default scheduling rule – if physical therapy was going to be provided, occupational therapy should be scheduled as well, regardless of any evaluation or determination of reasonableness by the occupational therapist. Throughout her tenure, Relator remembers only one instance in which occupational therapy was not scheduled in addition to physical therapy because the occupational therapist did not think the resident needed

occupational therapy. Faustino demanded that the occupational therapist go back, reassess and provide therapy to the resident, allowing that patient to be categorized at the Ultra High level.

- <u>Get in all rehabilitation therapy before hospice arrived</u>. Because a resident would not qualify for therapy services once Hospice was in place, Faustino directed that DORs push to have therapy provided in advance of any hospice involvement.

52. In terms of the resident's targeted length of stay at the Contracted Facility, Faustino instructed the DORs <u>to push to keep Medicare Part A residents for at least 30 days of skilled rehabilitation therapy.</u> These minimum lengths of stay were set without regard to the patient's actual rehabilitation needs. Faustino further instructed that the 30-day length of stay for Medicare Part A patients was regardless of whether or not the patient's goal was to go home or stay in-house in long term care.

53. As set forth above, Medicare requires patient assessments to take place on certain days to determine the RUG levels. Medicare allows some flexibility in scheduling the prospective payment system assessment reference date (referred to herein as "PPS ARD"), permitting it to take place before or sometimes after the specified ARDs of the 5th, 14th, 30th, 50th and 90th day of the resident's stay in the facility. Through Regional Director Faustino, Defendants manipulated the assessment dates to maximize patient RUG categories and reimbursement from the government. Faustino instructed the DORs to move the PPS ARDs to other days if they would be able to capture a higher RUG level on a certain day as opposed to another.

54. There is not the same flexibility in assessment reference date for a Change of Therapy ("COT ARD"). The SNF must report a Change of Therapy if the therapy delivered for

17

seven days after the PPS ARD does not match the last reported RUG.

55.     Despite the required 7 day review for a COT, however, Faustino stated that RUG levels should not be changed unless therapists tried for 1-2 weeks with multiple efforts per day to get those therapy minutes in.

### B.     Defendants Reinforced  The Ultra High Rehabilitation Targets Through Constant Communication and Tracking Reports

#### 1.     Weekly Conference Calls  and Daily Communication

56.     On Tuesdays, Faustino held a weekly Director Meeting by conference call during which the DORs from each of the Contracted Facilities reported on their Facilities' success in obtaining certain RUG level percentages for the previous week.

57.     The DORs were either reprimanded or advised on how to improve their SNFs' RUG levels if Faustino found them to be too low (below 70-80% for Ultra High).  Faustino conveyed to the DORs that they would not be doing their jobs if their Ultra High RUG levels for Part A residents dropped down to below 70-80%.

58.     For the most part, the Select Medical staff at the Contracted Facilities met Faustino's percentage targets for number of Medicare Part A residents receiving Ultra High levels of therapy.  For example, the below Contracted Facilities reported during weekly Director Meetings that their Facilities had achieved the following Ultra High RUG percentages for the specified weeks:

**Franklin County**:

- **87%** Ultra High RUG level (week of October 6, 2014);

**Green Hill**:  •  **95%** Ultra High RUG level (week of October 6, 2014);

- **95%** Ultra High RUG level (week of October 13, 2014);

- **88%** Ultra High RUG level (week of October 20, 2014).

**The Jewish Home**:

- **89%** Ultra High RUG level (week of October 6, 2014);

**Ramapo Manor**:

- **95%** Ultra High RUG level (week of October 6, 2014);
- **94%** Ultra High RUG level (week of October 13, 2014);
- **92%** Ultra High RUG level (week of October 20, 2014).

**Abingdon**:

- **87%** Ultra High RUG level (week of October 6, 2014);
- **89%** Ultra High RUG level (week of October 13, 2014).

**Ashbrook**:

- **86%** Ultra High RUG level (week of October 13, 2014);
- **85%** Ultra High RUG level (week of October 20, 2014).

**Buckingham**:

- **95%** Ultra High RUG level (week of October 13, 2014);
- **94%** Ultra High RUG level (week of October 20, 2014).

**Llanfair:**

- **75%** Ultra High RUG levels (weeks of October 6 & 20, 2014).

**Merwick**:

- **93%** Ultra High RUG level (week of October 13, 2014);
- **94%** Ultra High RUG level (week of October 20, 2014).

**Windsor Garden:**

- **93%** Ultra High RUG level (week of October 6, 2014);
- **88%** Ultra High RUG level (week of October 13, 2014).

59.    All of the above-listed Contracted Facilities met – and even exceeded – the Ultra

High therapy target of 70-80% for Medicare Part A residents.  Many of the Facilities had over 90% of all Medicare Part A residents receiving at least 720 minutes of therapy a week, or RUG level Ultra High.

60.     In addition to the weekly conference calls, Faustino provided constant direction through daily emails or calls.  Through these communications, he would repeatedly request increased therapy minutes for residents.  He was hyper-focused on maintaining Ultra High RUG levels.

61.     For example, on November 3, 2014, he questioned Relator as to why her Facility had missed the Ultra High category (requiring 720 therapy minutes) by only providing 690 minutes of therapy to Resident #1.  In order to achieve the Ultra High RUG, the PPS assessment date for the patient was moved a day later, allowing Select Medical to provide additional therapy minutes during the shifted 7 day period and justify the Ultra High RUG.

62.     Further, he would sometimes direct Relator to schedule therapy for newly admitted Medicare Part A patients even before the therapist had a chance to evaluate the patient to determine whether or not they were even going to recommend any therapy.  Faustino would instruct Relator to immediately schedule the therapist for an evaluation plus an immediate 75 minutes of therapy for new patients.  This direction was purely based on the patient's Medicare Part A insurance.

2.     **"Med A Logs"**

63.     Defendants closely monitored the RUG levels of the Medicare Part A residents at the Contracted Facilities.  One of the ways they tracked RUG levels was through the use of reports called Medicare A Logs ("Med A Logs").  The Med A Logs were one-page reports that could be run off of the online computer system, Casamba.  They were specific to each facility (e.g., Crouse, Ashbrook, Franklin County) and gave a one-month snapshot of all the Medicare

Part A residents and the RUG level of therapy they received on each day of the month.  The Med A Log also listed the percentage and number of residents at the different RUG levels (e.g., Ultra High, Very High).

64.     Select Medical upper management, the Regional Directors and the DORs all had access to the Med A Logs.  It is Relator's belief that Regional Director Faustino consulted these reports on a daily basis to monitor the RUG levels of the residents at the Contracted Facilities to make sure that the Facilities were meeting the corporate target of 70-80% Ultra High therapy. As a DOR, Relator herself reviewed these reports several times a week in trying to achieve the RUG level goals of 70-80% Ultra High.   And, in advance of the weekly Director Meeting conference call, all DORs emailed their Facilities' Med A Logs to Faustino for his review and then discussion on the call.

65.     For example, the Medicare A Log for the month of September 2014 for Franklin County shows that from September 17th through 30th, <u>100% of the Medicare Part A residents</u> were at the Ultra High RUG level.  In addition, for the first part of the month, the percentage of residents at RUG Ultra High was between 66%-87%.  Thus, the total percentage for the month of September was 88% of residents were in the Ultra High RUG category for Medicare reimbursement.

### 3.     <u>Other Reports Tracking RUG Percentages and Setting 70%-80% Ultra High RUG Level Targets</u>

66.     In addition to the Med A Logs tracking each facility's RUG levels for Medicare Part A patients, Defendants' staff prepared a quarterly report for each Contracted Facility called the "Rehabilitation Department Quarterly Report."   The Quarterly Report was reviewed internally by Defendants as well as distributed to the Contracted Facility.   Typically, the Quarterly Report focused significantly on residents' therapy RUG levels.

67.     For example, in the 2-page Quarterly Report for Crouse for the 2nd Quarter of 2014, there is a section titled "Analysis of Goals Achieved and on-going Programs" which includes RUG distributions.  The Report states that in April 2014, on average 94% of residents received Ultra High levels of therapy, in May 2014, 86% and in June 2014, 93%.  The Quarterly Report lists "Goals for the 3rd quarter of 2014."  The Report states these goals as:

> To maintain the RUG distribution to: 70-80% RU [Ultra High], 20-30% RV [Very High], 7% RH and 5 to 10% RM [Medium]

(emphasis added).

These preset goals could not possibly relate to the medical needs of the residents but instead represent corporate targets to increase profits.

68.     Also the Quarterly Report reiterates Defendants' directive to increase lengths of stay for Medicare Part A residents: "To maintain, or even increase, the average length of stay of Medicare A residents for the entire quarter to 30-35 days- Medically appropriate residents with secondary payer."

### C.     Defendants' Regional Director Faustino Remotely Increased Therapy Minutes to Achieve Ultra High RUG Levels Based on Profit not Medical Necessity

69.     In addition to continually verbally directing and pressuring the DORs to provide Ultra High levels of therapy to their Medicare Part A residents, Faustino sometimes secretly increased the scheduled number of therapy minutes on his own even though it was the DOR's responsibility to schedule therapy for residents.  As discussed above, Faustino could access the therapy schedule remotely from wherever he was working at the time through the computer program Casamba.

70.     On at least 50 occasions and likely many more, Faustino surreptitiously accessed the planner for scheduling therapy minutes at Crouse and increased the number of minutes

Relator had originally scheduled for the resident.  For example, if Relator had scheduled 45 minutes of physical therapy for a resident, he might covertly change the therapy minutes to 90. He did this mostly with regard to Medicare Part A beneficiaries but also sometimes with respect to residents with other types of insurance.  He stated that the therapy minutes needed to be increased in order to ensure that they were meeting their residents' rehabilitation needs, yet he never reviewed or asked about the residents' medical records before increasing the minutes, most often to reach the Ultra High RUG category.  <u>He even sometimes increased the number of therapy minutes for residents who had been discharged or who had passed away, but had not been taken off the schedule yet</u>.

71.     The same unlawful conduct involving remotely increasing the amount of therapy minutes occurred at another of the Contracted Facilities, Franklin County.  The Rehabilitation Technician at Franklin County, Betty Case, fulfilled the duties of the DOR, including scheduling therapy minutes.  However, Faustino would go into the EMR system almost every night and change the minutes that Case put into the planner earlier in the day in order to capture a higher reimbursement amount.  He usually demanded that the therapists get over 90 minutes in one day for one discipline, even if this meant going back to patients dozens of times throughout the day, getting them out of bed when sick or attempting to make them participate despite their refusals.

72.     For example, for therapy at the Contracted Facility Crouse on October 17, 2014, Relator had scheduled a Medicare Part A Resident #2 for 30 minutes of occupational therapy. The resident had refused therapy the previous three out of four days, one time stating that "all you people is making me worse."  The night before the scheduled 30 minutes of occupational therapy, Faustino had remotely and unjustifiably increased the scheduled number of therapy minutes to 90 minutes, an unreasonable amount of therapy for this patient.

73.    In around October 2014, Resident #3 had been receiving approximately 60-70 minutes of physical therapy and speech therapy at Crouse.  Without regard to the patient's medical needs, Faustino questioned why the patient also was not receiving occupational therapy and stated erroneously that if physical therapy picks someone up then occupational therapy should be able to pick them up as well.  Sometime around October 24, 2014, Faustino remotely changed the number of scheduled therapy minutes for Resident #3; he basically doubled the number of minutes to 145 minutes for physical therapy and 140 minutes for ST.

74.    On around October 20, 2014, Faustino changed the number of scheduled speech therapy minutes for Resident #4 at Crouse from 70 minutes to 210 minutes for one day of speech therapy.

75.    Typically, the DOR would print out the next day's schedule with proposed therapy minutes and distribute to the therapists a day in advance.  In the evenings, Faustino would access the schedule and increase the number of therapy minutes so that residents were receiving Ultra High levels of therapy.  When the therapists logged onto their computers the next day, the number of planned therapy minutes on the computer schedule did not match the paper schedule distributed by the DOR, due to Faustino's increases.  Relator would change the number of therapy minutes on the computer back to what was originally planned and the therapists would then perform therapy based on the lower number of minutes scheduled by Relator.

76.    It is not clear whether Faustino used the same illicit tactics in remotely increasing therapy minutes at the other Contracted Facilities in New Jersey and New York, as he did for Crouse and Franklin County.  He may have secretly increased the therapy minutes, or it is possible that the DORs automatically scheduled Ultra High levels of therapy consistent with his directives, eliminating the need for Faustino to secretly increase the scheduled therapy to achieve

the Ultra High RUG levels.

**VII.     Defendants Billed or Caused the Facilities to Bill Medicare for Therapy Services that were Medically Unreasonable and Inappropriate**

77.     By insisting that the vast majority of Medicare Part A residents receive Ultra High levels of therapy, Defendants billed or caused the Contracted Facilities to bill for therapy that was excessive in frequency and duration and, therefore, medically unreasonable and inappropriate.  Further, these Ultra High levels of therapy of at least 720 minutes per week were sometimes potentially harmful, or at least quite taxing, to frail and elderly patients.

78.     The DORs at the Contracted Facilities were constantly directed to pressure the therapists to approach residents multiple times a day in order to meet the number of scheduled minutes necessary to achieve the Ultra High RUG levels.  And Medicare Part A residents' therapy was scheduled for the morning so that the therapists would have the whole day to return to the resident if necessary.  Residents who were feeling unwell, sleeping or uncooperative were approached many times a day to try to coax them into therapy.

79.     For example, on September 4, 2014 via email, Faustino directed Relator to schedule more therapy minutes for a Crouse Resident #5 for that day.  The 72-year-old woman was a Medicare Part A beneficiary who had been admitted to Crouse on August 22, 2014 following a qualifying hospital stay.  The resident had been receiving physical and occupational therapy.  She was not doing well and was slowly declining.  Without consulting the patient's medical records, talking to the therapists or consulting with Relator, Faustino directed Relator to schedule more therapy time for the patient.  On the same day he made this demand, Resident #5 was admitted to the hospital and died shortly thereafter.  This patient obviously did not need the benefit of more skilled rehabilitation therapy as she was near-death.

80.     By way of another representative example, Faustino directed another resident, #6,

receive excessive amounts of therapy to earn high reimbursements amounts, despite the evidence that the Resident did not need therapy and was functioning independently.  Resident #6 was an 87-year-old female long-term resident at Crouse.  After a hospital stay, she was re-admitted to Crouse on around October 6, 2014, and immediately put on a plan of physical therapy and occupational therapy despite not needing any therapy according to the Assistant Director of Nursing, Katrina Pushlar.  On October 13, 2014, Assistant Director of Nursing Pushlar emailed Faustino and stated that she had reviewed Resident #6's chart and interviewed staff and that since the resident had returned from the hospital, she was independent with all activities and did not have anything to work on in therapy.  Pushlar wrote, "I have no nursing documentation to support skilled therapy services."   Despite this, Faustino instructed to continue providing therapy services and even on October 16th complained to Relator that they had not scheduled enough therapy to continue to bill the patient at the Ultra High RUG level:  "You're losing RU days[.]"  Resident #6 went on to receive two weeks' of therapy despite lack of clinical need.

81.     In addition, with regard to Resident #6, Faustino manipulated the discharge date as well as the assessment dates in order to maximize Medicare reimbursement.  In deciding whether to discharge Resident #6 from therapy on Sunday or Monday after weeks of therapy, Faustino decided against Sunday because the "facility will miss out on 1 day of [M]edicare [reimbursement]."  He settled on Monday which would allow the facility to do a Day 14 PPS assessment confirming the Very High RUG level and avoid having to do a COT which would lower the RUG category.

82.     For another resident, Faustino pushed the discharge date one day later to receive the reimbursement for that additional day.  Resident #7, a 76-year-old Medicare Part A beneficiary, received an extra day of medically unnecessary therapy as a result.  In directing

26

Relator and the therapists to provide an extra day of Very High RUG level therapy, Faustino stated in an email, "let's not miss one RV [RUG Very High] day please."

83.     Defendants' fraudulent efforts were successful - almost all Contracted Facilities maintained 70-80% of Medicare Part A residents at Ultra High levels of therapy, with many Facilities exceeding the target.  See paragraph 58 above (*e.g.,* Green Hill 95% RU for week of October 6, 2014; Buckingham 95% RU for the week of October 13, 2014).

84.     The nationwide average Medicare billing at Ultra High therapy levels was 54% in 2012 and even 54% has been criticized as fraudulently inflated.  See Christopher Weaver, How Medicare Rewards Copious Nursing-Home Therapy, Wall St. J., at Aug. 16, 2015.  Defendants' billing during the Relevant Time Period at 70-90% is far in excess of the nationwide average and is evidence of Defendants' purposeful scheme to inflate billing for therapy at its Contracted Facilities.

85.     Through this conduct, the government was overbilled by millions of dollars.  For 2013 alone, Medicare reimbursed over $50 million for rehabilitation services at the Contracted Facilities, with Ramapo Manor (over $10 million in 2013), Buckingham (over $8 million in 2013), Merwick (over $8 million in 2013) and the Jewish Home (over $6 million in 2013) receiving the most in reimbursement.  See CMS, the Skilled Nursing Facility Utilization and Payment Public Use File.

86.     The DOR at each Contracted Facility was responsible for submitting the insurance billing at the end of the month.  The DOR filled out the billing for each resident, including Medicare Part A residents.  The billing was false in that it reflected inflated RUG levels for medically unreasonable therapy minutes. The DOR would then submit the billing for each resident to the billing department at Select Medical's headquarters which would then

submit it to Medicare and other payers.

## VIII.   CMS Data Confirms Relator's Allegations

87.     An analysis of CMS data, specifically, the Skilled Nursing Facility Utilization and Payment Public Use File, confirms Relator's allegations regarding Defendants' fraudulent billing for inflated RUG therapy levels and lengths of stay.  The CMS data corroborates the allegations herein that the Company, motivated by profit, set Ultra High therapy targets of 70-80% and length of stay at 30 days.

88.     For 2013, the overwhelmingly majority of the Contracted Facilities billed Medicare for Part A residents at Ultra High RUG levels at 81-100% of therapy days.   For example, Buckingham, located in Norwood, New Jersey, charged Medicare for 100% of its Medicare Part A residents' therapy at the Ultra High level for 2013.  The Contracted Facilities of Llanfair, Merwick, Venetian (formerly Briarwood), Windsor Garden and the Jewish Home all billed Medicare at RUG Ultra High for over 90% of their Medicare Part A patients' therapy days in 2013 and Ramapo Manor, Abingdon and Ashbrook all billed RUG Ultra High for over 80% of therapy days.

89.     For 2013, the Contracted Facilities achieved an average length of stay of 28 days for Medicare Part A patients, with some Facilities maintaining an average length of stay as high as 33 (Llanfair) and 35 (Windsor Gardens) days.

90.     In sum, Relator's allegations of fraud set forth herein are clearly confirmed by the CMS data showing the Contracted Facilities regularly billing Medicare and receiving reimbursement for Ultra High therapy levels and lengths of stay, consistent with Defendants' corporate targets to maximize profits without regard to patients' therapy needs.

## IX.    COUNTS

### COUNT I

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)[1986] and
### 31 U.S.C. §3729(a)(1)(A)[2009]

91.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

92.    Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

93.    By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT II

### FEDERAL FALSE CLAIMS ACT
### 31  U.S.C. §3729(a)(1)(B)[2009]

94.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

95.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

96.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## X.   REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in her favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

Further, Relator requests that she receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## XI.   DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.


Dated: June 17, 2016                    BERGER & MONTAGUE, P.C.

By: _Shauna B. Itri_

Shauna B. Itri (ID#044372005)
Joy P. Clairmont
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000 Telephone
(215) 875-4604 Facsimile